POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 16-10169-B-l3 |
| | ) | |
| Frank Miranda Dores and | ) | DC No. AMM-2 |
| Mary Anne Souza Dores, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ———————————————— | ) | |

**MEMORANDUM DECISION ON BUNNETT & COMPANY
AND ENERGY FEEDS INTERNATIONAL, LLC'S
MOTION TO DISMISS CASE**

**INTRODUCTION**

"Revenge should have no bounds" muses King Claudius to Laertes as they connive a star-crossed tactical plan for Prince Hamlet's early demise.[1] While successful, their plan resulted in unintended and tragic consequences for most of the principal characters in the famous play. This case illustrates how far two parties' perceived condign for the other's assumed wrongs may go when one party ends up in Bankruptcy Court.

Here, a former employee of two suppliers of components of dairy cattle nutrition, who left over issues of customer treatment and job related stress, was sued by his former employers for allegedly competing against them. After the employee and his spouse filed this bankruptcy case, the lawsuit was stayed but facts were exposed suggesting the debtors were not candid with the court and creditors.

---

[1] William Shakespeare's "Hamlet" Act IV Scene 7.

Unfortunately, the debtors' efforts to either be protected from retribution or execute their own plan for the former employer's comeuppance intersected with a debtor's disclosure requirements under the Bankruptcy Code and 11 U.S.C. § 1307(c)'s discretionary dismissal "for cause."[2] As discussed in more detail below, though unstated in § 1307, "bad faith" is "cause" for dismissal. The court finds bad faith here and dismisses the bankruptcy case as being in the best interests of creditors.

## PERTINENT FACTS

1. Pre-petition Events:

Frank Miranda Dores ("Frank") and Mary Anne Souza Dores ("Mary Anne") (collectively the "Debtors" or the "Dores") are married.[3] Frank worked for Bunnett & Company and its related company, Energy Feeds International, LLC (collectively, "Bunnett"), for eight years until his resignation from both companies on October 23, 2015.[4] While employed at Bunnett, Frank received a lucrative salary, in excess of $300,000 a year. Bunnett distributes nutritional supplements for dairy cows. Bunnett's former primary supplier for sodium bicarbonate was Natural Soda, LLC ("Natural Soda"); its former primary supplier for inert fats was Wawasan Agrolipids, a Malaysian company.[5]

When Frank resigned as general manager for both companies on October

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code 11 U.S.C. §'s 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037.

[3] The court will refer to the debtors by their first names. Since another witness in this case, Frank's mother, is also named Mary Dores, she will be referred to as "Mary." The court is doing this for ease of reference and no disrespect is intended.

[4] Joint statement of undisputed facts (doc. #336 at ¶ 2).

[5] *Id.* at ¶ 1.

2

23, 2015, he claimed he was suffering from stress fostered by policy and management changes at Bunnett.[6]  Both parties concede there is no express contractual basis preventing Frank from competing with Bunnett.  When Frank resigned, two other sales people also resigned from Bunnett, Ray Gearheart and John Franklin.[7]

Mary Anne is an appraiser.  She works in Atwater, California, where Frank and Mary Anne reside.  When Frank resigned from Bunnett, he and Mary Anne formed a company, FM Ag Enterprises, Inc. ("FM Ag").  Mary Anne testified that it was not their intention for Frank to work for FM Ag.  However, shortly after he left Bunnett, Frank told Andrew Lott, a hauler Frank worked with, that his new contact information was FM Ag.  In early November 2015, a subsidiary of Wawasan, Paros Limited ("Paros"), paid FM Ag $20,000 for a marketing study purportedly prepared by Mary Anne.  Mary Anne does not have a copy of that study and has never produced it.

November 2015 proved a pivotal month.  Frank, John Franklin and Ray Gearheart joined forces in negotiating with Natural Soda for a sales agent relationship.  The three hired the same law firm to represent them in that negotiation.  After final documentation was exchanged, the negotiations were abruptly aborted.  During November and the following months, Frank had either received phone calls from or had contacted various suppliers and customers of Bunnett, including Mission Ag, Dewco, OCI International, Inc. ("OCI"),  and Wawasan.  Frank arranged relationships with Wawasan and his other contacts, including dairymen, over the period of a few months.  Wawasan's primary contact in America was through an American subsidiary, Agrofin.  Wei Su was

---

[6]Frank applied for worker's compensation because of stress-related issues.

[7]Bunnett also presented testimony that Frank compromised his company computer's hard drive and removed approximately 1,000 "files" from the memory before returning the computer.  His "company's iPad" was returned with factory settings.

the primary contact at Agrofin.

Also in November 2015, Frank withdrew his worker's compensation claim. With counsel's assistance, he pursued a claim for disability and began receiving disability payments. The *bona fides* of the disability claim would prove to be a substantial issue in the bankruptcy case.

In late November 2015, Bunnett sued Frank, Natural Soda and others in the Texas State Court for various business torts and trade infringement. The Texas State Court issued a temporary restraining order restricting Frank's contacts with his former business associates, customers and suppliers. In December 2015, Frank removed the Texas litigation to the Federal District Court in the Western District of Texas. At this time, and until early January 2016, Frank "disappeared" and became "nonexistent."[8]

In the beginning of January 2016, Ray Gearheart was contacted by Wawasan to discuss a way monies could be paid to Frank so that he could have funds to defray his mounting legal costs and living expenses. Frank testified that Wawasan's generosity was possibly motivated by their desire for Frank to work for them "at some moment in the future." In mid-January 2016, Frank and Ray Gearheart communicated. Ray testified that the Wawasan payments would amount to $40,000 which would be payable at $20,000 in January 2016 with the remaining $20,000 to be paid "sometime later." Frank gave Ray the names of friends and family members and provided contact information where the money

---

[8]The parties have stipulated to the admission of testimony of certain witnesses by deposition instead of trial testimony. Some of these depositions were taken in the Texas lawsuits. Ray Gearheart was originally to testify at trial. However, Bunnett was unsuccessful in serving a subpoena. Bunnett and Dores stipulated that Bunnett had not been able to procure Ray Gearheart's live testimony by any reasonable means and therefore under Federal Rule of Evidence 804(a), the court deemed Ray Gearheart "unavailable." The deposition testimony of Wei Su, Todd Gearheart, Ray Gearheart's son, Brian D'Ewart of Dewco, John Franklin and Andrew Lott was allowed by stipulation of the parties. While the court is therefore unable to assess credibility of those witnesses, a risk both parties are evidently willing to take, the court has reviewed the deposition testimony highlighted by both parties. The reference above is to the transcript of Wei Su's deposition. 40:13-25; 61:7-62:7.

could be transmitted. The names Ray Gearheart received were Marcio Relva, Frank's brother-in-law, Angel Hernandez, an acquaintance and contractor, and Teresa Miranda, Frank's grandmother. Teresa Miranda was being cared for by Mary Dores, Frank's mother. Frank's and Mary Anne's testimony was that they disclaimed any interest in the proposed payments then and always.

Meanwhile, the Federal District Court in Texas also issued a temporary restraining order which was set to expire at the beginning of February 2016. As did the restraining order issued by the Texas State Court, the Federal District Court order essentially prevented Frank from competing with Bunnett until the litigation could be resolved.

2. The Bankruptcy Filing and Coincident Events:

Frank and Mary Anne filed this chapter 13 bankruptcy case on January 22, 2016. Both Frank and Mary Anne signed the petition, schedules and statement of affairs. They also signed declarations regarding their projected disposable income. Both declarations stated that Frank was disabled and unable to work and would be unable to receive the same salary as he had in the previous six months. Neither the schedules nor the declarations mention anything about the $40,000 payable by Wawasan.

Ray Gearheart arranged for his son Todd to receive funds from Wawasan and Todd then forwarded the funds to the persons Frank identified. According to the testimony, Mr. Relva, Mr. Hernandez, and Mary Dores were all contacted by Frank and alerted that monies for Frank and Mary Anne's benefit could soon come to them in the form of checks. In fact, Todd Gearheart received $20,000 from Wawasan on January 26, 2016, and the next day sent $5,000 to Mario Relva and $15,000 to Angel Hernandez. Wawasan sent the other $20,000 about two months later, in March 2016. Ten Thousand dollars ($10,000) of the second payment was given to Angel Hernandez and the remaining $10,000 to Teresa

Miranda; because she was in Mary's care, Mary cashed the check and handled the money.

Frank and Mary Anne had their meeting of creditors under U.S.C. § 341(a) of the Bankruptcy Code on March 8, 2016. No mention was made of the payments from Wawasan.[9]

Immediately after the bankruptcy was filed, Frank and Mary Anne filed a motion for contempt against Bunnett for pursuing discovery in the Texas Federal Court action violating the automatic stay (DC No. FW-1, Doc. #7). Bunnett filed a countermotion for stay relief and to confirm the absence of the automatic stay of § 362 (DC No. AMM-1, Doc. #31) on February 9, 2016. Those motions have not been heard.

Frank and Mary Anne filed amended schedules on March 23, 2016 (Doc. #87). The amendments increased their tax claims (Frank and Mary Anne's 2015 taxes had been liquidated) and added taxes due to the Franchise Tax Board. The amendments also listed various changes in their Official Form 122C-2 regarding their projected income. (Doc. #88.) The $40,000 payments from Wawasan were not disclosed.

3. Events Following the Bankruptcy Filing:

On May 23, 2016, Frank and Mary Anne's chapter 13 plan was confirmed without objection. The plan provides for monthly payments to the chapter 13 trustee of $1,205 for sixty (60) months. Frank and Mary Anne propose to surrender their "investment" real property. They propose to continue making their house payments and payments on two timeshares owned by a trust. They will continue to make payments on a 2016 Ford Lariat and on a 2013 Lincoln Navigator. The order confirming plan does provide that the case will be set for

---

[9]Exhibit 3.

1  annual review of the Dores' income by the trustee.

2      Bunnett filed no proof of claim in the bankruptcy case. Bunnett also did

3  not object to confirmation of the chapter 13 plan.

4      Following scheduling conferences on the motion for contempt and

5  countermotion for stay relief, Bunnett and the Dores negotiated a proposed

6  settlement of their differences. During the course of that negotiation and in the

7  context of the continuing Texas litigation, Bunnett discovered the previously

8  undisclosed $40,000 in Wawasan payments. When Bunnett confronted the

9  Debtors with this information, Frank and Mary Anne signed two additional

10  declarations which stated in part that they did not receive the funds directly nor

11  receive any benefit from the funds. However, other testimony was that a portion

12  of the money was used to pay an overdue school tuition bill for Frank and Mary

13  Anne's children, for payment on a timeshare, and for a payment on a storage

14  facility. The settlement was not finalized or approved. Twenty-thousand dollars

15  ($20,000) of the $40,000 in Wawasan payments was returned by Hernandez and

16  Relva to Frank and Mary Anne's counsel where it was deposited in counsel's

17  trust account. The remaining $20,000 is still missing but at least part of it was

18  spent by Hernandez and Mary Dores.

19      Bunnett's founder, Bill Bunnett, testified that Bunnett has filed another

20  lawsuit alleging RICO violations and other claims against numerous defendants,

21  including some of the recipients of the Wawasan payments. Mr. Bunnett testified

22  that Frank would be added as a defendant if the bankruptcy case was dismissed.

23  On August 17, 2016, this motion to dismiss was filed (the "Motion").[10]

24  / / /

25  / / /

26  _____

27      [10]Doc. #161.

28

**JURISDICTION**

This court has jurisdiction of this contested matter by reference from the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 157(b)(2)(A).  The district court has jurisdiction pursuant to 28 U.S.C. § 1334(b) in that this is a civil proceeding arising under Title 11 of the United States Bankruptcy Code.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Bunnett and the Debtors agree that this court can hear and determine this matter if it is ever determined to be a matter that cannot be heard and determined of right by a bankruptcy judge under under 28 U.S.C. § 157(c)(2).[11]

**CONTENTIONS OF THE PARTIES**

Bunnett contends that the failure of the Dores to disclose Frank's pre- and post-petition continued contacts with those involved in the dairy feed industry after leaving Bunnett's employment, the establishment of FM Ag as a facade to veil future payments for Frank, and failure to disclose the $40,000 in Wawasan payments, establish that this chapter 13 case was filed in bad faith and should be dismissed with prejudice.  Bunnett points to the various documentary and testimonial evidence contradicting Frank's and Mary Anne's version of events and their continued insistence that they did not receive any benefit from the $40,000 as indicative of bad faith and supports dismissal with prejudice.

The Dores contend that a review of the totality of the circumstances, as required by controlling Ninth Circuit authority in deciding a motion to dismiss, shows that Bunnett has not met its burden of establishing "cause" for dismissal on the grounds of bad faith.  The Dores rely on their subjective belief regarding

---

[11]Final pre-trial order (doc. #361).

1   the ownership and use of the funds paid by Wawasan and emphasize the fact that

2   no contract prevented Frank from entering into relationships competitive with

3   Bunnett.  The Dores also contend that the court should take into account the

4   debilitating stress Frank suffered at the hands of Bunnett.  Alternatively, the

5   Debtors contend that, even if the court is inclined to dismiss Frank from the

6   bankruptcy case, Mary Anne should be permitted to continue the chapter 13 case

7   until she receives a discharge.

8

9                              **DISCUSSION**

10        1. <u>Legal Framework, Burden and Standard of Proof.</u>

11        Section 1307(c) sets forth a non exclusive list of factors that constitute

12   "cause" for conversion or dismissal.  *Schlegel v. Billingslea, Jr. (In re Schlegel)*,

13   526 B.R. 333, 338 (9th Cir. BAP 2015).  Although not specifically listed, bad

14   faith is a "cause" for dismissal under § 1307(c).  *Eisen v. Curry (In re Eisen)*, 14

15   F.3d 469, 470 (9th Cir. 1994).  In this Circuit, bankruptcy courts make good faith

16   determinations on a case-by-case basis, after considering the totality of the

17   circumstances.  *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir.

18   1999).  Debtors may be found to have either filed the bankruptcy petition or a

19   chapter 13 plan in bad faith.  *Ellsworth v. Lifescape Medical Associates, P.C. (In

20   re Ellsworth*), 455 B.R. 904, 914 (9th Cir. BAP 2011).  Even though the court

21   may have found impliedly or explicitly that a chapter 13 plan was proposed in

22   "good faith," the court can review that finding post-confirmation if new

23   information comes to light.  *In re Luxford*, 368 B.R. 63 (Bankr. D.Montana

24   2007).  Further, a creditor need not file a proof of claim to have standing to move

25   to dismiss for cause.  *de la Salle v. U.S. Bank, N.A. (In re de la Salle)*, 461 B.R.

26   593, 604 (9th Cir. BAP 2011).

27   / /

28
                                        9

The parties in this case agree that the "factors" set forth in *Leavitt* are the framework for the court's analysis. The so-called "*Leavitt* factors" are: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his chapter 13 petition in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. *In re Leavitt* 171 F.3d at 1224. In addition, a "court must make its good faith determination in light of all militating factors." *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 876 (9th Cir. BAP 2002) (citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 (9th Cir. 1982)). While the application of the *Leavitt* factors inform the process, "the court is not obligated to count the four *Leavitt* factors as though they present some sort of a box-score but rather is to consider them all and weigh them in judging the 'totality of the circumstances.'" *In re Lehr*, 479 B.R. 90, 98 (Bank. N.D.Cal. 2012). "The bankruptcy court is not required to find that each *[Leavitt]* factor is satisfied or even to weigh each factor equally." *Khan v. Curry (In re Khan)*, 523 B.R. 175, 185 (9th Cir. BAP 2014). Rather, "[t]he *Leavitt* factors are simply tools that the bankruptcy court employs in considering the totality of the circumstances." *Id.*

Before looking at the case through the prism of the *Leavitt* factors, the Dores have asked the court to require the movants to provide "clear and convincing" evidence in support of the Motion. The court declines to do so. The "preponderance of the evidence" standard has been applied by courts in this Circuit to motions to dismiss under chapter 7, *Aspen Skiing Company v. Cherrett (In re Cherrett)*, 523 B.R. 660, 669 (9th Cir. BAP 2014) and in assessing motions to dismiss under chapter 11. *In re Sullivan*, 522 B.R. 604, 614 (9th Cir. BAP 2014). In an unpublished decision, a bankruptcy court in Idaho has applied the "preponderance of the evidence" standard in a chapter 13 motion to dismiss. *In*

10

*re Kieffer*, 2015 WL 7450087 at *5 (Bankr. D.Idaho, November 23, 2015).

The debtors cite *In re Mark*, 336 B.R. 260, 265 (Bankr. D.Maryland 2006) and the Supreme Court in *Addington v. Texas*, 441, U.S. 418, 424 (1979) by analogy to support their contention that a "clear and convincing" standard of proof applies to the court's determination that the debtors' chapter 13 case was not filed in good faith. The argument is misplaced. The court in *Mark* was deciding a motion under § 362(c)(3) to extend the automatic stay where the *presumption of bad faith* had arisen. Section 362(c)(3)(C) specifies that "clear and convincing" is the standard of proof the debtor bears in rebutting the statutory *presumption* of bad faith. The *Addington* case dealt with the standard of proof needed to civilly commit someone involuntarily to a state mental hospital. Neither case stands for the proposition that the "clear and convincing" standard should supplant "preponderance of the evidence" in assessing a motion to dismiss under § 1307. This court will apply the "preponderance of the evidence" standard.[12]

The burden of proof squarely lies with the movant in this case, Bunnett. The determination of whether a debtor filed a petition or plan in bad faith and that dismissal for cause is justified is left to the sound discretion of the bankruptcy court. *In re Leavitt*, 171 F.3d at 1222-23; *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *Greatwood v. U.S. (In re Greatwood)*, 194 B.R. 637-39 (9th Cir. BAP 1996), *aff'd*, 120 F.3d 268 (9th Cir. 1997). The *Leavitt* factors will be applied to Frank and Mary successively.

2. The First *Leavitt* Factor: Misrepresentation of Facts in Petition, Unfair Manipulation of the Bankruptcy Code or Otherwise Filed Chapter 13 Petition in

---

[12]The court also notes that unlike the fundamental right of liberty discussed in *Addington*, "a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy." See, *Grogan v. Garner*, 498 U.S. 279, 286 (1991) citing *U.S. v. Kras*, 409 U.S. 434, 445-46 (1973).

an Inequitable Manner.

 *Frank Dores* - A finding of bad faith supporting dismissal of a bankruptcy case does not require fraudulent intent by the debtor.  *In re Leavitt* 171 F.3d at 1224; *In re Gress*, 257 B.R. 563 (Bankr. D.Mont. 2000).  The court in *Gress* noted:

> Neither malice nor actual fraud is required to find a lack of good faith.  The bankruptcy judge is not required to have evidence of debtor illwill directed at creditors, or that debtor was affirmatively attempting to violate the law-malfeasance is not a prerequisite to bad faith.

*Gress* at 568 quoted in *Luxord* at 70-71.  See also, *In re Powers*, 135 B.R. 980, 994 (Bankr. C.D. Cal. 1991) ( relying on *In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1986).

 The court had the opportunity to observe Frank's demeanor as a witness.  Frank's testimony was often combative, especially when questioned by opposing counsel.  The court admonished him on many occasions to answer the question asked and not discuss matters beyond the scope of the question or even on the same topic.  Frank's testimony was contradicted by other witnesses or simply not credible.

 For example, Frank's testimony was internally inconsistent on the issue of him "backing up" the Bunnett computer before it was returned.  He testified that he updated the computer with a Windows 10 program was "inadvertent."[13] However, he also testified that before updating the computer, he backed up the files to prevent possible loss, thus contradicts the claim that updating was "accidental."  Then he also stated that updating the computer was something "everyone did."  His testimony also conflicted with that of his wife, Mary Anne,

---

[13]Testimony of Frank Dores. 1-88:22-89:24.  There were three days of testimony. Transcript references will begin with the day of testimony ("1," "2," or "3") followed by page and line numbers.

with respect to the services performed by Mary Anne for Paros' benefit. Mary Anne testified that the work for Paros was "not an appraisal." Frank testified that his wife performed appraisal services for Paros. Frank testified that he did not work for Agrofin, the subsidiary of Wawasan, or assist them with sales of product in October and November 2015. Frank later testified and explained he provided "assistance" and that "you don't close doors."

The court finds as fact that the inconsistencies in Frank's testimony substantially reduced his credibility in testifying on critical issues in the trial on the Motion. His testimony is not completely credible and was entitled to little probative weight without corroboration. *In re Taylor*, 514 F.2d, 1370, 1373-74 (9th Cir. 1975).

Frank was not candid when he signed his declaration regarding the adjustment to the chapter 13 Means Test.[14] Frank stated in a written declaration that "he is on disability and he is not able to work due to symptoms caused by the stress related to his employment with Bunnett." He also stated that when he does return to work, he will not be able to work in the same kind of high-stress environment as before. However, other testimony significantly conflicts with Frank's statements. Ray Gearhart, a former sales agent for Bunnett, testified that Frank told him shortly after separating from Bunnett that he was applying to be a distributor for similar dairy industry nutrition products, including those sold by OCI and Wawasan. There is also Frank, Ray Gearhart and John Franklin's aborted negotiations with Natural Soda.

Brian D'Ewart who worked for Dewco, another feed product representative, testified that Frank offered services in trying to help him source products. Frank introduced Mr. D'Ewart to other suppliers of potassium

---

[14]Doc. #1.

13

carbonate.  Frank also connected the Dewco company with Agrofin.  Andy Lott, a hauler, testified that Frank spoke to him on the phone and told him that he would be setting up a company, FM Ag, to source product.  His communications included Frank arranging another supplier in the industry, Mission Ag, to "book a load" with Lott Trucking.  Frank also negotiated with Wei K. Yong Su to be a sales agent for Agrofin and to be paid a commission.  Wei Su worked with Agrofin.  These negotiations did not result in an agreement.

When confronted with these facts, Frank testified that he either did not remember or he was "helping friends."  At one moment, Frank testified that helping his friends was not the same thing as "assistance."  He also testified that during the period beginning in November of 2015 to an uncertain date, he blocked cell phone calls.  Yet, the record is replete with numerous contacts that suggest otherwise.  While Frank's memory loss due to stress and the medications he was taking combating that stress are certainly legitimate, Frank's actions in continuing to maintain contact are strongly inconsistent.  While the court cannot make a finding as to the legitimacy of Frank's claim for disability benefits and will not, the fact is that his activities, whether or not "anti-competitive" to Bunnett, are not consistent with statements in a declaration relating to Frank's ability to contribute income to fund a chapter 13 plan.

The court finds as fact that Frank's declaration dated January 22, 2016, filed with the court as part of the schedules in this case is, at best misleading and, at worst, knowingly false.

Even after Frank and Mary Anne filed bankruptcy, Frank's contacts in the industry continued.  Ray Gearheart testified that in March 2016, Frank told him that several dairymen, all of whom Frank dealt with, shifted their source of inert fats from Bunnett to  Wawasan.  There is also testimony of post-petition contacts between Frank and Deb Mize of Mission Ag, Brian D'Ewart of Dewco and

14

others.  Ray Gearheart testified that Frank did provide phone numbers for a
prospective customer, he also testified that Frank never helped make any sales for
Mr. Gearheart, who is employed as a salesman for Agrofin.[15]

However, Frank's explanation to the court for making these contacts was
either to "help friends" or to arrange for employment "at some future time."
Further, Frank stated that, to him, it was not work because "he did not get paid
for it."  Frank justified these contacts by saying these suppliers and customers of
Bunnett first contacted him because they were dissatisfied with Bunnett.
However, there was no testimony that Frank told former customers he was
disconnecting from the business.  Andy Lott, the hauler, did testify that Frank
told him he needed to "tend to his (Frank's) health due to stress he had
experienced in the last ten to twelve years."  However, even Frank testified that
he did not tell any suppliers or customers that he was not disengaging from the
business, indicating his intention to continue in the same business that had caused
his stress.  These contradictory statements and positions further reduce the
credibility of Frank's testimony and declaration regarding his disability.

The court finds as fact that even after the filing of the petition, Frank was
continuing to contact or be contacted by customers and suppliers contradicting
his statements in the declaration filed with the petition that once he returned to
work he would not be able to continue in the "high stress" job he had worked in
before.

In addition to the inconsistent statements in the declaration, Frank failed to
reveal on the bankruptcy schedules the $40,000 payment from Wawasan that had
been filtered through Ray and Todd Gearheart and paid to friends and family
members.  On  this issue, the evolution of the reasons why the payment was not

---

[15]Ray Gearheart deposition August 23, 2016, 125:17-126:10.

disclosed calls into question the *bona fide*s of the schedules.  In a declaration filed June 21, 2016, in connection with the aborted settlement agreement, Frank stated that he did not actually receive the $40,000 but "h[a]s  been told that they [sic] were sent to friends and family members to be used for my benefit if I requested."[16]  Frank stated that since he never had, touched or asked for the money, it was not disclosed.  However, other testimony is contradictory.  Ray Gearheart testified that in early January 2016, he discussed with Frank payments from Wawasan and possibly sending checks to other people since Frank was being sued by Bunnett.  Ray Gearheart told his son, Todd Gearheart, that they needed to distance themselves from any transactions with Wawasan, for Frank's benefit because Bunnett's lawyers were "watching them like hawks."  Yet Frank told Ray Gearheart, who arranged for the funds transfer, the names of the people who were to receive the monies.  Ray Gearheart instructed his son, Todd, who initially received the funds from Wawasan, to send the money to specific persons.  Todd Gearheart testified that the intent was that the money was to end up in Frank's hands.  Frank told his brother-in-law, Marcio Relva, in January 2016 that he (Relva) "might be receiving a check in the mail."  Frank asked Angel Hernandez, a friend, if someone could send a check to him "in my name."  Frank told his mother, Mary Dores, January 2016 that someone "may send a check to her."[17]  The check Mary Dores received was made out to Teresa Miranda, Mary Dores' mother, and Frank's grandmother.[18]  Frank says that he disclaimed the funds and did not consider them his.  However, even if the court would construe a $40,000 payment from a company that has no real relationship to Frank other

---

[16]Doc. #143.

[17]1-192:5-9.

[18]1-190:2-191:19.

16

than as a potential employer or supplier as a gift, that is no excuse not to reveal that information in the schedules.

Equally disconcerting is the amount of time between receipt of the monies by Frank's family and friends and the disclosure of the information. It was not until June 2016, nearly six months after the bankruptcy was filed, that the transaction was disclosed. Still, the transaction is not included in any amended schedules.

The court finds as fact that Frank knew of the impending payments from Wawasan in January and March 2016 and did not reveal these transfers on his bankruptcy schedules.

*Mary Anne Souza Dores* - The court observed the demeanor of Mary Anne as a witness. She was direct and responsive to the questions asked of her by opposing counsel and her counsel . She did not evade when asked questions concerning the 2016 money transfers from Wawasan and was cooperative when reviewing documents. While an earnest witness, the objective facts in this matter largely refute her version of events.

FM Ag Enterprises, the company established by Frank and Mary Anne in October 2015, was, according to Mary Anne, to be a vehicle for her appraisal business. However, the formative documents state otherwise. Bunnett has made much of the fact that FM Ag Enterprises received $20,000 for a purported "market survey" prepared by Mary Anne for Paros, a Wawasan subsidiary. However, Mary Anne has not been able to produce a copy of the document even though she testified she prepared the report on her own computer. While by itself suspicious, Bunnett has produced no evidence affirming that Paros/Wawasan did not receive the report or denied commissioning a report. This is true even though Bunnett offered the testimony of Wei Su of Agrofin (by deposition) in support of its case. The court was directed to no testimony confirming Bunnett's theory that

17

the report was a pretense for a payment by Wawasan for Frank's benefit.

The court finds as fact Bunnett has not met its burden of proof that the payment for the market report prepared by Mary Anne for Paros was other than a payment for services rendered.

Mary Anne has maintained that she first learned of the $40,000 payment from Wawasan in June 2016 in connection with the aborted settlement of the issues between Bunnett and the Dores at the time she signed her declaration concerning that settlement agreement.[19]  She also maintains that she did not know that any of the funds were used for her family's benefit.  Mary Dores, Mary Anne's mother-in-law, is a frequent visitor at Frank and Mary Anne's residence and assists with the care of Frank and Mary Anne's children.  Part of the money Mary received from Wawasan was used to pay bills for Frank, including private school tuition and a timeshare.[20]  Mary claims that she took the tuition bill and did not tell anyone and paid the bill.[21]  Mary said she had never done that before.[22]  Mary Anne's declaration signed in connection with the settlement says that she never directly or indirectly received any payment or anything of value from Todd Gearheart or Wawasan.  That is simply false.  The payment of their children's tuition and payment for the timeshare Mary made with those funds clearly benefitted the family.

At the same time, there is no direct evidence that Mary Anne knew of the payments at the time the schedules were signed or the amendments filed.  However, the schedules clearly state that it is both spouses' responsibility to be

---

[19]Doc. #143.

[20]1-194:14-195:18.

[21]1-196:17-197:6.

[22]*Id.*

18

1  fully candid in providing information in the schedules.

2          In discovery in this case, Mary Anne declined to answer certain deposition

3  questions on the ground of the marital-communication privilege.  The court has

4  not found authority stating that an adverse inference is warranted where a party

5  has invoked the marital-communication privilege.  However, the same or similar

6  consequences are at risk if an adverse inference could be drawn from someone

7  invoking the attorney-client privilege.  Like the attorney-client privilege which is

8  "regarded as of sufficient social importance to justify some sacrifice of the

9  availability of evidence relevant to the administration of justice." *Knorr-Bremse*

10  *Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed.

11  Cir. 2004) (*en banc*) (citation and internal quotations marks omitted).  The

12  marital-communications privilege [which] protects the marital bond, is

13  considered to have a value "higher than truth."  *Whitney v. City of Milan,*

14  *Tennessee* 2014 WL 11411675 (WD Tennessee, February 27, 2014) quoting

15  *United States v. Brown*, 605 F.2d 389, 396 (8th Cir. 1979) *cert. denied*, 444 U.S.

16  972 (1979).

17          The court finds that Bunnett is not entitled to an adverse inference that

18  Mary Anne discussed with Frank the monies paid or to be paid by Wawasan at

19  the time the petition was filed because she invoked the marital-communication

20  privilege

21          Nevertheless, the court takes seriously Mary Anne's obligation to

22  independently verify the truth of statements made in the schedules.  The court

23  notes that it is inconsistent with the closeness of the Dores' family and the

24  assistance that Mary provided to Frank and Mary Anne that it would not "come

25  up" in conversation about payments received by Mary from Todd Gearheart or

26  that Mary used some of those funds to pay Mary Anne's children's school tuition.

27  This inconsistency is further bolstered by the fact that Mary testified that she had

28

not paid bills for Mary Anne and Frank before.  This unconventional occurrence would certainly be the topic of a comment or conversation.

Independently, Marcio Relva, Mary Anne's brother-in-law, received $5,000 on or about January 27, 2016.  Wouldn't this spark a comment or conversation between Relva and Mary Anne or at least between Mary Anne and her sister?  Finally, Frank was highly compensated by Bunnett before leaving.  The substantial change in the Dores' economic position between September 2015 to January 2016 suggest that both Frank and Mary Anne were aware of their financial needs and were vitally interested in how those needs would be satisfied.  It is simply not credible that Mary Anne knew nothing of the Wawasan payments.

The court notes that Mary Anne and Frank were represented by competent counsel at the time of the filing of the bankruptcy case and throughout the case.  The Debtors, being represented by an attorney, "can be charged with constructive knowledge of the law's requirements."  *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050 (9th Cir. 1987).  Even in the unlikely event that Mary Anne did not know or have reason to know of the assistance of the Wawasan payments, she and Frank are charged with knowing the requirements of law.

The court finds as fact that Mary Anne knew, should have known or had the means to learn of the Wawasan payments at the time of the filing of the bankruptcy case and certainly thereafter in time to testify truthfully at the first meeting of creditors or when amended schedules were filed.  The payments were not disclosed.

Based on the above findings of fact, the court finds Frank and Mary Ann misrepresented facts in their petition, schedules, accompanying declarations and testimony at the meeting of creditors.  The first *Leavitt* factor favors Bunnett.

3. The Second *Leavitt* Factor: Debtors' History of Filings and Dismissals.

The court has been provided no evidence that either Frank or Mary Anne

have filed any previous bankruptcy case.  The court therefore finds this factor in favor of Frank and Mary Anne.

4. The Third *Leavitt* Factor: The Debtor's Intention to Defeat State Court Litigation.

*Frank Dores* - At the time the bankruptcy was filed, Frank was embroiled in litigation with Bunnett over his leaving the companies and allegedly interfering with their customers and suppliers.  A temporary restraining order was issued by the Texas state court as well as the Texas Federal District Court.  During the pendency of the Federal litigation, the bankruptcy was filed.

The impact of this litigation on the decisions Frank made is evidenced in at least three instances.  First, in November 2015, Frank quickly aborted final negotiations and execution of a sales representative agreement with one of Bunnett's suppliers, Natural Soda.  Ray Gearheart testified that it was his understanding Frank aborted the negotiations because of his fear of being sued.

Second, the structure of the Wawasan payments seem designed to avoid the effect of the injunction issued by the Federal District Court in Texas.  Todd Gearheart testified that he was told by Ray Gearheart that the payments were going to be made indirectly because Frank was "hampered by an injunction."

Third, Frank initially pursued a worker's compensation claim against Bunnett for job-related stress.  That claim was later withdrawn in favor of a disability claim which, according to the Gearhearts, was largely litigation connected.  Also, a review of the bankruptcy schedules shows that, other than the Bunnett litigation, there was no other claim or aggressive creditor action facing Frank or Mary Anne at the time the bankruptcy was filed.

Bad faith exists where the debtor's only purpose is to defeat state court litigation.  *In re Eisen*, 14 F.3d at 470.  The evidence strongly suggests that, as to Frank, his only purpose for filing was to encumber litigation.  By the time the

bankruptcy was filed the Texas District Court had issued a temporary restraining order.  The Texas state court had issued one earlier.  Also, Frank knew that he had contacted or been contacted by customers or suppliers of Bunnett and was continuing to maintain those contacts.  He told some of those suppliers and customers that he was looking forward to working with them whether then, or sometime in the future.

The court finds as fact that Frank's primary purpose in filing the bankruptcy petition was to avoid or defeat the pending litigation against him prosecuted by Bunnett.

*Mary Anne Souza Dores* - Mary Anne was not named as a defendant in the Bunnett litigation so the court could not find that defeating state court litigation was the only purpose Mary Anne had in joining the bankruptcy petition.  She was faced with a substantial loss of income affecting her family and she testified that she was going to need to substantially increase her own workload in order for her family to make ends meet.  The defense of the Bunnett litigation would certainly have depleted Frank and Mary Anne's community property.  There were many other motivating factors facing Mary Anne who was not a party to the litigation.  Some of those factors may have also entered into Frank's decision to file the bankruptcy case.  However, the difference is that Frank was a named defendant and was already subjected to two temporary restraining orders.  Mary Anne was not at the time of the filing of the bankruptcy case.

The court finds as fact that defeating state court litigation was not the primary factor in Mary Anne joining in the bankruptcy petition.

5.  The Fourth *Leavitt* Factor: The Presence of Egregious Behavior.

*Frank Dores* - In making a determination of whether egregious behavior is present, the court considers the debtors' pre-petition conduct as well as post-petition conduct.  *In re Luxford*, 368 B.R. at 74 citing *In re Pickering* , 195 B.R.

22

759, 765 (Bankr. D.Montana 1996), citing *Neufeld v. Freeman*, 794 F.2d 149, 152-53 (4th Cir. 1986); *see also Solomon v. Cosby (In re Soloman)*, 67 F.3d 1128, 1134 (4th Cir. 1995). Egregious behavior, such as concealing information from the court, violating injunctions, filing unauthorized petitions, hiding or undervaluing assets, making post-petition payments to pre-pretition creditors, violating non-bankruptcy laws or otherwise demonstrating fraudulent conduct, without excuse, demonstrates bad faith and prejudices creditors. See *In re Chabot*, 411 B.R. 685, 704-05 (citing *Leavitt*, 171 F.3d at 1223-24) and *In re Cortez*, 349 B.R. 608, 613-14 (Bankr. N.D. Cal. 2006).

Pre-petition, Frank negotiated with at least one Bunnett supplier and almost signed a sales agreement. He also either inadvertently or intentionally erased data on a company computer before returning it to Bunnett.[23]

As set forth in the court's previous findings, Frank knew of the Wawasan payments, identified those who should receive them and continued to maintain that he had no knowledge of them and disclaimed them. Those payments remained hidden until June 2016 when Bunnett discovered them.

A false oath may involve a false statement or omission in the debtor's bankruptcy schedules or statement of financial affairs. *Searles v. Reilly, Chapter 7 Trustee (In re Searles)*, 317 B.R. 368, 377 (9th Cir. BAP 2004); *Fogel Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58 (9th Cir. BAP 1999). A

---

[23]Bunnett offered the expert testimony of a computer forensics expert, David Kalat, who opined that Frank's installation of the Windows 10 upgrade was intentionally done resulting in compromising historical data on "the hard drive" and Frank eliminated over 1,000 files from the computer. In post-trial submissions, the Dores argue that Kalat's testimony should not be accepted because he was not "offered" as an expert. The court notes that no objection was made by the Dores' counsel at the time of Mr. Kalat's testimony or request to *voir dire* the witness. Independently, the court notes the Federal Rule of Evidence 702 does not require any particular procedure for the trial court to follow with respect to expert testimony. See *Metabolife International Link v. Ornick*, 364 F.3d 832, 843 (9th Cir. 2001); *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *First Marblehead Corporation v. House*, 541 F.3d 36, 41 n.3 (1st Cir. 2008).

false oath is complete when it is made.  *In re Searles* at 377.  "Where the offending oath is contained in the schedules or required statements, the debtor's continuing duty to assure the accuracy of such schedules and statements means that the proper method of correction is a formal amendment of the schedules." *Id.*  No such amendment occurred.

The court finds as fact that Frank concealed from the court the Wawasan payments even though he had knowledge of them and that was egregious.

*Mary Ann Souza Dores* - As set forth above, the court has found that Mary Anne knew, or had reason to know and the means to find out, about the Wawasan payments.  The court has also found that Bunnett has failed to prove by a preponderance of the evidence any pre-petition egregious behavior by Mary Anne Dores.  However, the knowing concealment of the Wawasan payments and the delay in revealing the payments does amount to egregious behavior.

Independently, the court is troubled by the testimony of family friend, Angel Hernandez, who testified that in July 2016, shortly after the filing of the June declaration, Mary Anne told Angel Hernandez that he could do anything he wanted with the money he received.[24]  Mr. Hernandez' testimony on this subject has not been refuted.  This aggravates the concealment and shows a cavalier attitude towards Mary Anne's disclosure duties under the bankruptcy law.

The court finds as fact that Mary Anne was complicit in concealing the Wawasan payments from the court and disregarded her disclosure obligations under the bankruptcy law which was egregious.

6.  Mitigating Factors.

*Frank Dores* - Frank's stress, which he testified was caused by his deteriorating relationship with Bunnett, resulted in him being diagnosed with

---

[24] 2-48:23-49:16.

24

depression and other disorders. Debtors called an expert, Dr. Howsepian, a well qualified board certified psychiatrist for over 20 years. After examining Frank in October 2016, he noted that Frank was suffering from several anxiety induced disorders, including dissociative disorder, anxiety disorder, panic disorder and bipolar disorder Type 1. Dr. Howsepian also reviewed various medications Frank had been taking and determined that Frank was not fabricating memory loss during the period before the examination. He concluded that Frank had a loss of memory and a loss of cognitive function. This explains Frank's lack of recollection of specific events, however makes other testimony about those events uncontroverted. Dr. Howsepian did not opine about Frank's capacity for veracity when he signed the schedules and declarations at issue in this case.

The fact that approximately $20,000 of the original $40,000 of the Wawasan payments has been returned to Debtors' counsel is another mitigating factor but does not excuse the failure to disclose the payments.

There is no evidence the Debtors have failed to perform their chapter 13 plan thus far indicating that, for now, the Debtors are complying with their obligations. While not excusing egregious actions surrounding disclosure requirements, it does suggest that Frank and Mary Anne are attempting to comply with their obligations under chapter 13. The confirmed plan provides that the trustee is to review the case annually and the Debtors are to provide income tax returns in addition to all of Frank's pay stubs. While again not excusing the failure of the Debtors to comply with disclosure obligations or submitting misleading documents at the beginning of the case, the court does see this as a mitigating factor.

*Mary Anne Souza Dores* - As can be discerned from the previous discussion, Bunnett's case against Mary Anne Dores is simply not as strong as the case against Frank. In addition to the mitigating factors outlined above, the

25

court is not convinced that Mary Anne's behavior necessarily warrants a dismissal with prejudice. Mary Anne is not a party to any pending lawsuit involving Bunnett. The evidence against Mary Anne relating to the pre-petition actions does not suggest any effort to prejudice Bunnett or any other creditor.

Mary Anne's demeanor as a witness shows she was trying to be cooperative. Frank has been subjected to consistent and unremitting scrutiny from Bunnett in their ongoing efforts to litigate the claims they believe they have against Frank.

In addition, the aggressive actions by Bunnett has caused Mary Anne and Frank to incur a large amount of attorney's fees. At the same time, so has Bunnett. However, Frank and Mary Anne being the Debtors here do not have the same economic strength as Bunnett. Upon dismissal, Frank will likely be named in Bunnett's pending litigation in the Northern District of California. However, the benefit of bankruptcy protection comes with costs. One cost is candid disclosure of assets.

The court finds as fact after weighing the totality of the circumstances that there is cause to dismiss the bankruptcy case on the grounds of bad faith. The mitigating factors have been considered by the court in reaching this conclusion.

7. <u>Dismissal is in the Best of the Creditors.</u>

Once cause for dismissal is established, the court must determine if the case should be converted or dismissed. 11 U. S. C. § 1307(c). The decision is motivated by an analysis of "whichever is in the best interest of credtiors and the estate." § 1307(c).

The court has reviewed the schedules in this matter. Other than the recovery of approximately $20,000 which has been turned over to Debtors' counsel, a conversion of the case to a chapter 7 is not of any benefit to the creditors. Recovery of the remaining $20,000 will require prosecution of an

26

adversary proceeding with attendant litigation and collection risks.  The Debtors
have exempted most of the equity they have available in any assets.  There are a
few timeshare interests which, in the court's experience, do not generate a great
deal of interest in trustees because they often do not result in recovery of
substantial sums for the benefit of creditors.  There are vehicles which are
encumbered but if the equity is not exempt in the vehicles, the Debtors would be
able to amend schedules to do so.

The overarching rationale for this decision, however, is the substantial
administrative expense which is involved in the case.  The Debtors have been
embroiled in the litigation with Bunnett on this Motion for nearly a year.  They
have incurred substantial attorney's fees.  While a large part of the Dores'
counsel's efforts did not benefit the bankruptcy estate, some claims will be made.
Thus, any "victory" for creditors by way of a dividend would be Pyrrhic, at best.
Therefore, there is no substantial benefit to creditors in converting the case to
chapter 7 and dismissal appears to be the best interest of the creditors and the
estate.

8. <u>Dismissal With Prejudice.</u>

As is clear from the above discussion, the court has analyzed the *Leavitt*
factors as they apply to both debtors in this case.  In *Leavitt*, the Ninth Circuit
held a dismissal with prejudice must be coupled with a finding of bad faith based
on egregious conduct.  *In re Leavitt*, 171 F.3d at 1224.  In other words, dismissal
with prejudice under § 349(a) is not meant to be a remedy for every instance of
debtor misconduct.  *Id.*

This court has weighed the totality of circumstances, including all
mitigating factors, and is convinced based upon the findings set forth above,
credibility of the witnesses the court has observed, the exhibits, and the
deposition testimony offered by both parties, that the dismissal of Frank's case

should be with prejudice.  There are numerous instances of egregious conduct coupled with bad faith.  However, the mitigating factors support the dismissal should be coupled with a bar of limited duration.

In contrast, while Mary Anne's case should be dismissed for cause due to "bad faith," the mitigating factors weigh heavily against a dismissal with prejudice.  While some of Mary Anne's conduct is egregious, the mitigating factors outweigh any type of bar at this time.

## CONCLUSION

"The Bard" in a dramatic fashion has exposed the consequences of the human frailty of revenge.  Those consequences include the unintended conclusions to recriminatory plans and schemes that have occurred in this case with neither side achieving its intended goal.  The court hopes that the curtain falls on this tragedy now.

Bunnett's motion to dismiss is granted.  Frank Miranda Dores is barred from filing another bankruptcy case for a period of 180 days from the date the order dismissing the case is final.  Mary Anne Souza Dores is not barred from refiling.  A separate order shall issue.[25]

**Dated:** Jun 07, 2017                              **By the Court**

René Lastreto II, Judge
**United States Bankruptcy Court**

---

[25]The above constitutes the court's findings of fact and conclusions of law pursuant to FRCP 52 made applicable to bankruptcy contested matters by Rules 9014(c) and 7052.

1
2
3

## Instructions to Clerk of Court
**Service List - Not Part of Order**/Judgment

4
5
6

    The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked ____, via the U.S. mail.

7
8

    Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and __X__ Other Persons Specified Below:

9
10

Matthew F. Prewitt, Esq.
Attorney at Law
233 South Wacker Drive, Suite 6600
Chicago, IL 60606

11
12
13

Michael K. Molzberger, Esq.
Attorney at Law
233 South Wacker Drive, Suite 6600
Chicago, IL 60606

14
15
16

Justin D. Harris, Esq.
Attorney at Law
7110 N. Fresno St., Suite 400
Fresno, CA 93720

17
18

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare Street, Suite 1401
Fresno, CA 93721

19
20
21
22
23
24
25
26
27
28